UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
DR. RACHEL WELLNER,

                              Plaintiff,

            -against-

THE CITY OF NEW YORK, P.O. NIGUEL VEGA,
Shield No.08642, Individually and in His Official Capacity,
P.O. NICOLETT DAVODIAN, Shield No. 24143,
Individually and in Her Official Capacity,
and P.O.s "JOHN DOE" #1-10, Individually and in their
Official Capacities, (the name"John Doe" being fictitious,
as the true names are presently unknown),

                           Defendants.
------------------------------------------------------------------------X

**16 Civ. 7032 (JGK)**

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL
DEMANDED**

**ECF CASE**

       Plaintiff, DR. RACHEL WELLNER ("Dr. Wellner" or "Plaintiff"), by her attorney, Jon L. Norinsberg, Esq., complaining of the defendants, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

       1.      Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of her civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

**JURISDICTION**

       2.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

       3.      Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.

## VENUE

4.      Venue is properly laid in the Southern District of New York under 28

U.S.C. § 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to

Fed. R. Civ. P. 38(b).

## PARTIES

6.      Plaintiff DR. RACHEL WELLNER is a Caucasian female and was at all relevant

times a resident of the City and State of New York.

**Dr. Wellner's Educational and Professional Background**

7.      Plaintiff DR. RACHEL WELLNER graduated *magna cum laude* from Dartmouth

College in 1997 with a Bachelor's of Arts degree in Spanish Literature.

8.      Plaintiff DR. RACHEL WELLNER completed her Master's degree in Public

Health from Columbia University in 2000.

9.      Plaintiff DR. RACHEL WELLNER graduated from Medical School at the

University of Connecticut in 2003.

10.     Upon graduating medical school, plaintiff DR. RACHEL WELLNER completed

her residency in general surgery at the Mount Sinai Hospital in 2008.

11.     In 2008, plaintiff DR. RACHEL WELLNER began a fellowship at the John

Wayne Cancer Institute.

12.     In 2009, plaintiff DR. RACHEL WELLNER was also appointed an assistant

clinical professor at The Mount Sinai Hospital and Elmhurst Hospital Center.

13.     In 2010, plaintiff DR. RACHEL WELLNER was appointed the Director of Breast Services at the New York Eye and Ear Infirmary, Continuum Cancer Centers of New York.

14.     In 2013, plaintiff DR. RACHEL WELLNER took a position as a surgical Oncologist at Hackensack University Medical Center.

15.     In 2015, plaintiff DR. RACHEL WELLNER left Hackensack University Medical Center to take the Senior Breast Surgeon position at Montefiore Medical Center.

**Dr. Wellner's Extensive Volunteer and Relief Work**

16.     In addition to her role as a surgical Oncologist, plaintiff DR. RACHEL WELLNER has, throughout her entire academic and professional career, consistently provided medical services to those in need throughout the world.

17.     In 1995, plaintiff DR. RACHEL WELLNER embarked on a medical mission to Nicaragua sponsored by the former Surgeon General Dr. C. Everett Koop.

18.     In 1998 and again in 1999, plaintiff DR. RACHEL WELLNER traveled to India on a relief mission to provide medical care in remote regions.

19.     In 2003 plaintiff DR. RACHEL WELLNER started a medical mission in the Dominican Republic.

20.     In 2010 plaintiff DR. RACHEL WELLNER traveled to Israel to start a Race for the Cure in Jerusalem.

**The Defendants in this Action**

21.     Defendant, the City of New York, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

22.     Defendant, the City of New York, maintains the New York City Police

Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, the City of New York.

23.     At all times hereinafter mentioned, the individually named defendants, P.O. NIGUEL VEGA, P.O. NICOLETT DAVODIAN, and P.O.s "JOHN DOE" #1-10, were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

24.     At all times hereinafter mentioned, the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

25.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting within the scope of their employment by defendant City of New York.

26.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting in furtherance of their employment by defendant City of New York.

## FACTS

**The Incident**

27.     On or about February 18, 2016, at approximately 10:30 A.M., plaintiff DR. RACHEL WELLNER stopped her 2006 Volvo station wagon at the northwest corner of 55th Street and Eighth Avenue, in the County, City, and State of New York.

28.     At the aforementioned time and place, the automobile's rear end was slightly abutting the crosswalk.

29.      Immediately thereafter, plaintiff DR. RACHEL WELLNER exited the vehicle and proceeded to enter the Vitamin Shoppe, 931 Eighth Avenue, at the corner of 55th Street and Eighth Avenue.

30.      From inside the Vitamin Shoppe, plaintiff DR. RACHEL WELLNER noticed defendant P.O. NIGUEL VEGA approaching her vehicle.

31.      Plaintiff DR. RACHEL WELLNER then exited the Vitamin Shoppe and asked defendant P.O. VEGA if she could simply move her car in order to avoid the ticket, and informed the police officers that she was a surgeon.

32.      Defendant P.O. VEGA denied plaintiff DR. RACHEL WELLNER's request.

33.      Thereafter, plaintiff DR. RACHEL WELLNER, returned to the Vitamin Shoppe to retrieve her car keys, and then went back to her vehicle.

34.      Defendant P.O. NICOLETT DAVODIAN, defendant P.O. VEGA's partner, began walking around the outside of plaintiff DR. RACHEL WELLNER'S vehicle.

35.      After several minutes plaintiff DR. RACHEL WELLNER rolled down the window and asked P.O. VEGA, "Is the ticket almost ready? I just operated on patients and I have emergencies I have to get to."

36.      Plaintiff DR. RACHEL WELLNER was dressed in hospital scrubs with the Montefiore Medical Center label clearly visible.

37.      Defendant P.O. VEGA responded to plaintiff DR. RACHEL WELLNER, in sum and substance, "Oh, you have somewhere more important to be? Do you think you are some kind of hero for being a doctor?"

38.      Plaintiff DR. RACHEL WELLNER responded by saying, in sum and substance, "No, I'm no hero, you guys are the heroes. I was just trying to tell you that I have important

patient issues I need to deal with, and my patients need my help" and again asked for her parking ticket.

39.   P.O. VEGA then responded by saying, in a sarcastic and condescending manner: "We know.  You're a doctor. You make more money.  You have more prestige.  You're more important than we are."   DR. WELLNER did not respond to these offensive comments.

40.   After several more minutes had passed, plaintiff DR. RACHEL WELLNER opened the door of her vehicle and asked how much longer it was going to take to write the ticket, and stated in sum and substance "I have somewhere better to be, I'm sure you do as well."

41.   Defendant P.O. VEGA then yelled "don't rush me" and "don't tell me how to do my job!"

42.   Plaintiff DR. RACHEL WELLNER then responded by stating, in sum and substance, "I'm not trying to do that.  I am just saying, how long could it possibly take for you to write a parking ticket?"

43.   Suddenly, and without any warning, defendant P.O. VEGA reached into Dr. Wellner's vehicle and attempted to pull plaintiff out of the vehicle by forcibly pressing his forearm into Dr. Wellner's chest and grabbing her chest area.

44.   Prior to reaching into the vehicle, defendant P.O. VEGA had never asked plaintiff DR. RACHEL WELLNER to step out of the vehicle, nor had he ever informed Dr. Wellner that she was under arrest.

45.   Plaintiff DR. RACHEL WELLNER then asked defendant P.O. VEGA to let go of her chest.

46.   Plaintiff DR. RACHEL WELLNER also pleaded with defendant P.O. DAVODIAN to help her.

47.     Defendant P.O. VEGA then released plaintiff DR. RACHEL WELLNER's chest.

48.     Thereafter, plaintiff DR. RACHEL WELLNER attempted to shut the door of her car, with the window remaining open.

49.     Defendant P.O. VEGA then re-opened the car door, reached into the vehicle and twisted plaintiff DR.RACHEL WELLNER's left arm to the point where she was afraid her shoulder was about to pop out of its socket.

50.     Plaintiff DR.RACHEL WELLNER then pleaded with defendant P.O. VEGA to release her arm, as she was in a lot of pain and could feel her shoulder about to dislocate.

51.     P.O. VEGA instead twisted plaintiff DR. RACHEL WELLNER's arm even harder.

52.     As a result of the foregoing, plaintiff DR. RACHEL WELLNER sustained, *inter alia*, a sprained left anterior shoulder from the force used by P.O. Vega.

53.     Plaintiff DR. RACHEL WELLNER was forced to seek medical care and treatment for this injury from Dr. H. Eric. Steibl.

54.     This use of force by P.O. VEGA was objectively unreasonable in light of the facts and circumstances surrounding the issuance of a parking ticket.

55.     Fearful of permanently injuring her shoulder -- which could have potentially ended her career as a surgical Oncologist -- plaintiff DR. RACHEL WELLNER stepped on the gas pedal while the vehicle was in 'park.'

56.     Defendant P.O. VEGA immediately backed up from the vehicle when the engine revved.

57.     Seeing that there was sufficient room to drive away without contacting the officer, plaintiff DR. RACHEL WELLNER put the car in 'drive' and drove off.

58.     Plaintiff DR. WELLNER pressed on the gas pedal solely to prevent defendant P.O. VEGA from dislocating her arm and from further hurting her.

59.     At no time did plaintiff DR. RACHEL WELLNER's vehicle come into contact with defendant P.O. VEGA.

60.     At no time did plaintiff DR. RACHEL WELLNER's car door come into contact with defendant P.O. VEGA.

61.     At no time was defendant P.O. VEGA pushed backwards by plaintiff DR. RACHEL WELLNER's vehicle.

62.     At no time was defendant P.O. VEGA injured as a result of plaintiff DR. RACHEL WELLNER driving away from the police assault.

63.     Plaintiff DR. RACHEL WELLNER was thereafter approached by uniformed members of the New York Police Department on West 54th Street.

64.     These officers approached plaintiff DR. RACHEL WELLNER's vehicle with guns drawn.

65.     Plaintiff DR. RACHEL WELLNER immediately surrendered to the officers.

66.     Thereafter, plaintiff DR. RACHEL WELLNER was placed under arrest.

67.     Plaintiff DR. RACHEL WELLNER was handcuffed and thrown to the frozen pavement.

**Post-Arrest**

68.     Thereafter, defendant P.O. DAVODIAN arrived on the scene, approached plaintiff DR. RACHEL WELLNER and stated, in sum and substance, "are you happy now, bitch?"

69.     After several minutes on the frozen pavement, plaintiff DR. RACHEL WELLNER was placed in a police car.

70.     Plaintiff DR. RACHEL WELLNER was thereafter transported to the 18th Police Precinct.

71.     While at the precinct, plaintiff DR. RACHEL WELLNER witnessed defendant P.O. VEGA "high-fiving" his fellow officers, laughing, and appearing totally uninjured.

72.     After twelve (12) hours, plaintiff DR. RACHEL WELLNER was transported to Central Booking.

73.     Upon leaving the 18th Police Precinct, plaintiff DR. WELLNER was immediately accosted by press, taking her picture and asking questions while she was being transported to the police vehicle.

74.     Plaintiff DR. RACHEL WELLNER arrived at Central Booking around 9:00 P.M

75.     Plaintiff DR. RACHEL WELLNER spent the night in "the Tombs" of Central Booking.

76.     At 10:00 A.M. plaintiff DR. RACHEL WELLNER was finally arraigned.

77.     At the arraignment, plaintiff DR. RACHEL WELLER learned, for the first time, that she was being charged with, *inter alia*, Reckless Endangerment in the Second Degree, Resisting Arrest, Leaving the Scene of an Incident Without Reporting, with Personal Injury, and Reckless Driving.

78.     In connection with this arrest, defendants filled out false and misleading police reports, and forwarded these reports to prosecutors in the New York County District Attorney's Office.

79.     Specifically, defendant police officers lied about plaintiff DR. RACHEL WELLNER hitting defendant P.O. VEGA with her vehicle.

80.     At no time did plaintiff DR. RACHEL WELLNER's vehicle come into any physical contact with defendant P.O. VEGA.

81.     Further, defendant P.O. DAVODIAN made material and false statements about her observations of plaintiff DR. RACHEL WELLNER prior to the arrest.

82.     Plaintiff DR. RACHEL WELLNER was released on her own recognizance.

83.     Due to defendants' unconstitutional and tortious conduct, plaintiff DR. RACHEL WELLNER was required to make multiple court appearances to defend herself against these fabricated accusations.

84.     Plaintiff was forced to retain Alan Futerfas, Esq., a criminal defense attorney, and pay a significant retainer.

85.     On July 12, 2016, plaintiff DR. RACHEL WELLNER pleaded guilty to New York Penal Law §240.20[5], which relates *solely* to obstructing vehicular or pedestrian traffic.

**Defendants, Under the Guise of Anonymous "Police Sources," Spread Outright Fabrications About The Incident To The Press.**

86.     By 5:48 P.M. on February 18, 2016, the same day as the arrest, and a day *before* plaintiff DR. RACHEL WELLNER's arraignment, The New York Post ran an online story entitled "Surgeon Trying To Avoid Parking Ticket Rams Car Into Cop: Police." In this initial article, the journalist reported that "A Bronx cancer surgeon was busted for *ramming a cop in the leg with her car* as she tried to avoid getting a double-parking ticket in Midtown on Thursday," and cited an unknown police source.

87.     The anonymous "police sources" were in fact defendant P.O.'s VEGA and DAVODIAN, as they were the only police officers with knowledge of the facts and circumstances surrounding the arrest of plaintiff DR. RACHEL WELLNER.

88.     On February 19, 2016, the false allegations had become even more damaging. Again citing "police sources," plaintiff DR. RACHEL WELLNER was now alleged to have said "I am a doctor. I have patients who are dying. *I'm the hero; the cops are not*!" The source also stated that plaintiff DR. RACHEL WELLNER "boasted that her job saving lives made her far superior to the lowly NYPD officers who hauled her away in cuffs for hitting a cop with her car in Midtown." This police source further stated that "[o]fficers were trying to reason with her about the summonses, but she wasn't having it. So she jumped in her car as the officer was trying to cuff her, and she sped off hitting the officer," and "[s]he started complaining that [the handcuffs] were too tight. She wanted to sound smart, like she was above us all, and she made some comment that 'It's hurting the such-and-such nerve in my hand.'"

89.     By the time the New York Post wrote a follow up on July 12, 2016, the lies told by the defendants, as anonymous "police sources," expanded to include homophobic slurs purportedly made by plaintiff DR. RACHEL WELLNER, to wit,  "[a]ll women who are cops are dykes[.]"

90.     The New York Post story containing these extreme lies was picked up by a variety of news organizations, including, but not limited to, the New York Daily News, the Daily Mail, Gothamist, W-PIX 11, and The Jewish Voice.

91.     A dramatic re-creation of the incident, as described by the anonymous "police sources" is also available on Youtube.com by Tomonews.net through the following link:

Wellner Incident Re-creation.

92.     This video shows plaintiff DR. RACHEL WELLNER as a "Hulk"- like character, breathing fire and jumping up and down on the hood of her car before hitting an officer with her vehicle.

93.     In sum, due to the "police sources" extreme exaggerations and outright lies, plaintiff DR. RACHEL WELLNER was subjected to widespread ridicule and criticism in the media.

**The Public's Reaction To The Press Coverage**

94.     After receiving extensive and highly damaging press coverage, based upon the exaggerations and outright fabrications of the defendants, plaintiff DR. RACHEL WELLNER has received, and continues to receive, a large amount of hate mail and has been the subject of relentless social media attacks.

95.     A New York Post article published on February 21, 2016 entitled "New Yorkers Fume At Surgeon Who Allegedly Injured Cop," documents the early stages of the social media attacks on plaintiff DR. RACHEL WELLNER.

96.     The article contains "tweets" written in reaction to the story. "I'm sure you believe you are God, but you are not above the law" read one tweet. "Dr. Rachel Wellner is an embarrassment to all doctors and should be put on leave without pay," a furious Jarel Portman tweeted at Montefiore Medical Center, where Wellner is a breast-cancer specialist.

97.     But the reaction to plaintiff DR. RACHEL WELLNER did not end in the digital realm.

98.     In a piece of illustrative hate-mail plaintiff DR. RACHEL WELLNER received, an anonymous person wrote, *inter alia*:

> "You are a disgrace to the many phyciialsn [*sic*] who respect the law but YOU think you are BETTER than others...better than police officers and above the law. And you have the nerve to call a woman officer a 'dyke.' Piss on you!!!!!!!!!! F*** you, you spoiled little Ivy League c***.F*** you."

**The Harm Done to Dr. Wellner's Professional Career and Reputation**

99.    Plaintiff DR. RACHEL WELLNER'S career has been destroyed as a result of the false and defamatory statements of the defendants.

100.    On July 5, 2016, plaintiff DR. RACHEL WELLNER was terminated from her position at Montefiore Medical Center.

101.    Since that date, plaintiff DR. RACHEL WELLNER has applied to dozens of positions, but no prospective employers have been willing to interview her despite her outstanding credentials.

102.    At the time of the filing of this complaint, plaintiff DR. RACHEL WELLNER is unemployed, and actively seeking employment daily.

103.    Due to defendants' unlawful actions, plaintiff DR. RACHEL WELLNER has not yet been, and will not in the future be able to continue her career as a surgical Oncologist, as no hospital will hire her.

104.    In sum, due to defendants unconstitutional and tortious actions, plaintiff DR. RACHEL WELLNER's personal reputation, professional reputation and career have been irreparably and permanently destroyed.

105.    As a result of the foregoing, plaintiff DR. RACHEL WELLNER sustained, *inter alia*, loss of liberty for and multiple court appearances, emotional distress, embarrassment and humiliation, loss of her chosen career, destruction of her personal and professional reputation, and deprivation of his constitutional rights.

**Plaintiff Suffered a Deprivation of Federal Civil Rights Under 42 U.S.C. § 1983**

106.    All of the aforementioned acts of defendants, their agents, servants and employees were carried out under the color of law.

107.    All of the aforementioned acts deprived plaintiff DR. RACHEL WELLNER of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

108.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all the actual and/or apparent authority attendant thereto.

109.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

110.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure or rule of his/her respective municipality/authority, which is forbidden by the Constitution of the United States.

**FIRST CLAIM FOR RELIEF**
**EXCESSIVE FORCE UNDER 42 U.S.C. §1983**

111.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "110" with the same force and effect as if fully set forth herein.

112.    The level of force employed by defendants was objectively unreasonable and in violation of plaintiff's constitutional rights.

113.    As a result of the foregoing, plaintiff DR. RACHEL WELLNER sustained, *inter alia*, loss of liberty, bodily injuries, emotional distress, embarrassment and humiliation, and deprivation of their constitutional rights.

**SECOND CLAIM FOR RELIEF**
**FAILURE TO INTERVENEUNDER 42 U.S.C. §1983**

114.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "113" as if the same were more fully set forth at length herein.

115.    Defendant police officers had an affirmative duty to intervene to protect the constitutional rights of plaintiff from being violated by other police officers in their presence.

116.    Defendant police officers violated plaintiff DR. RACHEL WELLNER's constitutional rights in the presence of their police colleagues.

117.    Defendant police officers had reason to know plaintiff's constitutional rights were being violated.

118.    Defendant police officers had a realistic opportunity to intervene to prevent the harm from occurring to plaintiff but failed to do so.

119.    Notwithstanding this opportunity, defendant police officers failed to intervene to prevent the violations of plaintiff's constitutional rights.

120.    As a result of the foregoing, plaintiff sustained, *inter alia*, bodily injuries, loss of liberty, emotional distress, embarrassment and humiliation and deprivation of their constitutional rights.

**THIRD CLAIM FOR RELIEF**
**DENIAL OF CONSTITUTIONAL RIGHT TO FAIR TRIAL**
**UNDER 42 U.S.C. § 1983**

121.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "120" as if the same were more fully set forth at length herein.

122.    Defendants created false evidence against plaintiff DR. RACHEL WELLNER.

123.    Defendants forwarded false evidence and false information to prosecutors in the New York County District Attorney's Office.

124.    In creating false evidence against plaintiff DR. RACHEL WELLNER, in forwarding false evidence and information to prosecutors, and in providing false and misleading testimony, defendants violated plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

125.    As a result of the foregoing, plaintiff's liberty was restricted for an extended period of time, was required to make multiple court appearances, and she was put in fear for his safety, was humiliated and subjected to handcuffing, and other physical restraints, without probable cause.

**FOURTH CLAIM FOR RELIEF**
**MALICIOUS ABUSE OF PROCESS UNDER 42 U.S.C. § 1983**

126.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "125" with the same force and effect as if fully set forth herein.

127.    The aforementioned individual defendants issued legal process to place plaintiff DR. RACHEL WELLNER under arrest.

128.    The aforementioned individual defendants arrest plaintiff DR. RACHEL WELLNER in order to obtain a collateral objective outside the legitimate ends of the legal process; namely embarrassing and humiliating plaintiff for her alleged condescending remarks toward defendants, and retribution towards plaintiff to "teach her a lesson" for her allegedly disrespectful behavior toward the officers.

129.    The aforementioned individual defendants acted with intent to do harm to plaintiff DR. RACHEL WELLNER, without excuse or justification.

130.    As a result of the foregoing, plaintiff DR. RACHEL WELLNER sustained, *inter alia*, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of her constitutional rights.

## FIFTH CLAIM FOR RELIEF
## "STIGMA PLUS" CLAIM UNDER 42 U.S.C. §  1983

131.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "130" as if the same were more fully set forth at length herein.

132.    The information provided by defendants to the press was materially false and misleading.

133.    As a result of false and misleading information provided to the press, plaintiff DR. RACHEL WELLNER was the subject of extensive and highly prejudicial news coverage, including stories in the New York Post, the Daily News, Gothamist, WPIX-11 and The Jewish Voice.

134.    The accusations regarding the language allegedly used by plaintiff DR. RACHEL WELLNER are plainly sufficiently derogatory to injure her reputation.

135.    As a result of defendants' statements to the press, plaintiff DR. RACHEL WELLNER's reputation was severely and permanently damaged. To this day, the story of plaintiff's purported statements to defendant police officers and actions are the first stories that appear when doing a Google search of her name on the Internet.

136.    As a result of defendants' statements to the press, plaintiff DR. RACHEL WELLNER lost her job at Montefiore Medical Center and lost her career as a surgical Oncologist.

137.   This material, government imposed burden imposed on DR. RACHEL WELLNER's career was in addition to and temporarily proximate to the stigma generated by the false and misleading accusations.

138.   As a result of defendants' statements to the press, plaintiff DR. RACHEL WELLNER was deprived of her liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, has been the subject of cyber-bullying, was forced to incur substantial legal expenses, had her personal and professional reputation destroyed, lost her employment at Montefiore Medical Center, and lost her livelihood as a surgical Oncologist.

### SIXTH CLAIM FOR RELIEF
### MUNICIPAL LIABILITY

139.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "138" as if the same were more fully set forth at length herein.

140.   At all times herein mentioned, defendant CITY OF NEW YORK, through the New York City Police Department, had a custom, practice and policy of allowing its police officers, detectives and/or investigators to make "off-the-record" statements to the press in high-profile criminal cases, thereby disclosing highly sensitive and/or damaging information from an ongoing criminal investigation, so as to inflame public opinion against defendants in such cases and deprive them of their constitutional right to a fair trial.

141.   The aforesaid policy, custom and practice can be inferred in part from repeated instances in which the New York City Police Department,  through its police officers, detectives and/or investigators, engaged in the following tactics in high-profile criminal cases:

       (a)   Providing systematic "leaks"of information to the press which were damaging to the accused;

    (b)    Releasing to the press negative information about the accused, including their prior arrest history and criminal record;

    (c)    Releasing to the press incriminating evidence which had been gathered against the accused;

    (d)    Expressing opinions about the accused's guilt or innocence prior to the commencement of trial;

    (e)    Maligning the character and reputation of the accused;

    (f)    Stating that the accused had engaged in similar conduct before without evidence to support such statements; and

    (g)    Commenting on the identity, testimony and/or credibility of prospective witnesses who would testify against the accused.

142.    In all of the above cases, law enforcement officials from the New York City Police Department, including but not limited, police officers, detectives, and/or investigators, made "off-the-record" statements to the press which involved one or more of the improper tactics enumerated in Paragraph "137", supra, and which resulted in extensive negative publicity against the accused which tainted the jury pool and deprived the accused of the constitutional right to a fair trial.

143.    The aforesaid policies, procedures, regulations, practices and/or customs were implemented by policymaking officials for the defendant City of New York, including but not limited to, the police commissioner(s) and/or other high-ranking officials of the New York City Police Department, who knew that:

    (a)   to a moral certainty such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

    (b)   that such issues either present police officers, detectives and/or investigators with difficult choices of the sort that instruction, training and/or supervision would

make less difficult, or that the need for further instruction, training and/or supervision was demonstrated by a history of such employees' mishandling such situations; and

(c)    despite their knowledge of said policies, procedures, regulations, practices and/or customs, the supervisory and policymaking officers and officials of the defendant CITY OF NEW YORK, as a matter of policy, practice and custom, perpetuated or failed to take steps to terminate said policies, practices and/or customs, did not discipline or otherwise properly supervise the employees engaged in them, did not effectively instruct, train and/or supervise such personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead sanctioned the policies, procedures, regulations, practices and/or customs described above, and in fact rewarded such employees by giving them promotions and bonuses, thereby evincing a deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the State of New York.

144.    The foregoing customs, policies, usages, practices, procedures and rules of the the CITY OF NEW YORK, as implemented by the New York City Police Department, constituted a deliberate indifference to the safety, well-being and constitutional rights of all defendants in high-profile criminal cases, including but not limited to, plaintiff DR. RACHEL WELLNER.

145.    The foregoing customs, policies, usages, practices, procedures and rules of the

CITY OF NEW YORK, as implemented by the New York City Police Department, were the proximate cause of the constitutional violations suffered by plaintiff DR. RACHEL WELLNER as alleged herein.

146.    The foregoing customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK, as implemented by the New York City Police Department, were the moving force behind the constitutional violations suffered by plaintiff DR. RACHEL WELLNER as alleged herein.

147.    As a proximate result of the foregoing practices and policies of the CITY OF NEW YORK, as implemented by the New York City Police Department, plaintiff DR. RACHEL WELLNER was denied her constitutional due process right to a fair trial has been personally and professionally destroyed.

**FIRST CLAIM FOR RELIEF**
**UNDER N.Y. STATE LAW ASSAULT**

148.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "147" with the same force and effect as if fully set forth herein.

149.    Plaintiff has complied with all the conditions precedent of the bringing of this action, and has complied with all provisions of the Charter of the City of New York, and the plaintiff has, prior to the bringing of this action and within ninety days after the injuries hereinafter described were received, duly served notice upon the Corporation Counsel and the Comptroller for the City of New York of their intention to sue upon the claim set forth. More than thirty days have elapsed since the presentation of the Notice of Claim on May 11, 2016, and that the said claim remains unadjusted and the said Comptroller has failed and/or refused to make any adjustment thereof. Plaintiff plans on appearing for a hearing pursuant to Municipal Law §50-h.

The instant action is being filed within one year and ninety days of the date in which plaintiffs' claims accrued.

150.    Defendants' aforementioned actions placed plaintiff DR. RACHEL WELLNER in apprehension of imminent harmful and offensive bodily contact.

151.    As a result of the foregoing, plaintiff DR. RACHEL WELLNER sustained, *inter alia*, loss of liberty, assault, battery, lost earnings, emotional distress, embarrassment and humiliation and deprivation of their constitutional rights.

152.    As a result of defendants' conduct, plaintiff DR. RACHEL WELLNER has suffered physical pain and mental anguish, together with shock, fright, apprehension, embarrassment, and humiliation.

### SECOND CLAIM FOR RELIEF
### UNDER N.Y. STATE LAW: BATTERY

153.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs numbered "1" through "152" with the same force and effect as if fully set forth herein.

154.    Defendant police officers touched plaintiff DR. RACHEL WELLNER in a harmful and offensive manner.

155.    Defendant police officers did so without privilege or consent from plaintiff DR. RACHEL WELLNER.

156.    As a result of defendants' conduct, plaintiff DR. RACHEL WELLNER has suffered physical pain and mental anguish, together with shock, fright, apprehension, embarrassment, and humiliation.

### THIRD CLAIM FOR
### RELIEF UNDER N.Y. STATE LAW: DEFAMATION

157.    Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs "1" through "156" as if the same were more fully set forth at length herein.

158.    Defendants provided false and misleading information to various news agencies and/or media outlets regarding plaintiff DR. RACHEL WELLNER.

159.    Defendants knew that the information they were providing to various news agencies and/or media outlets was false and misleading.

160.    Defendant acted with malice in making false and misleading statements about plaintiff DR. RACHEL WELLNER.

161.    Defendant acted with a reckless disregard for the truth in making false and misleading statements about plaintiff DR. RACHEL WELLNER.

162.    Defendants made such statements without privilege or authorization from plaintiff DR. RACHEL WELLNER.

163.    Defendants knew that their false allegations would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people.

164.    As a result of defendants' false statements to the press, plaintiff DR. RACHEL WELLNER was the subject of extensive and highly prejudicial news coverage.

165.    As a result of defendants' malicious lies, the story of plaintiff DR. RACHEL WELLNER's arrest became a local and national news story, destroying both her personal and professional reputation, subjecting her to public ridicule, causing her to lose her job and be forever blackballed in her industry.

<b>FOURTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW<br>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</b>

166.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "165" with the same force and effect as if fully set forth herein.

167.    The aforementioned conduct was extreme and outrageous, and exceeded all reasonable bounds of decency.

168.    The aforementioned conduct was committed by defendants while acting within the scope of their employment by defendant THE CITY OF NEW YORK.

169.    The aforementioned conduct was committed by defendants while acting in furtherance of their employment by defendant THE CITY OF NEW YORK.

170.    The aforementioned conduct was intentional and done for the sole purpose of causing severe emotional distress to plaintiffs.

171.    As a result of the aforementioned conduct, plaintiff DR. RACHEL WELLNER suffered severe emotional distress, physical and mental injury, together with embarrassment, humiliation, shock, fright and loss of freedom.

### FIFTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW
### NEGLIGENT HIRING/TRAINING/SUPERVISION/RETENTION

172.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "171" with the same force and effect as if fully set forth herein.

173.    Defendant the City of New York owed a duty to the public at large, including but not limited to plaintiffs, to exercise reasonable care in the selection, hiring and retention of all of its employees, and in particular, those employees with the job responsibility of dealing with the public at large.

174.    Defendant The City of New York failed to use reasonable care when it hired defendants polices officers.

175.    Defendant The City of New York failed to make reasonable inquiries into the background of defendant police officers.

176.   Had defendant The City of New York used reasonable care in inquiring into the background of defendant police officers, it would have learned that they were patently unqualified to serve as police officers in the New York City Police Department.

177.   As a result of the foregoing, defendant City of New York breached its duty to use reasonable care in the selection and hiring of all of its employees.

178.   As a result of defendant City of New York's negligence in hiring defendant police officers, plaintiff was subjected to excessive force by defendant police officers.

179.   Upon information and belief, this was not the first time that defendant police officers had used excessive force against a citizen of the City of New York.

180.   Defendant City of New York knew, or in the exercise of reasonable care, should have known, that defendants police officers had a propensity for using excessive force against citizens of the City of New York.

181.   Defendant The City of New York knew, or in the exercise of reasonable care, should have known, that defendant police officers had a propensity for engaging in grossly improper, inappropriate and unlawful conduct towards citizens of the City of New York, and then concealing such misconduct by making false accusations against such citizens.

182.   Notwithstanding The City of New York's knowledge of the propensities of defendant police officers defendant the City of New York retained defendant police officers as employees, and allowed them to continue to deal directly with the members of the public, including but not limited to, plaintiff DR. RACHEL WELLNER.

183.   In choosing to hire, and then retain, defendant police officers defendant City of New York breached its duty to the public at large, and to plaintiff DR. RACHEL WELLNER in particular, to use reasonable care in the selection and retention of its employees.

184.    Defendant City of New York was further negligent in failing to provide adequate training regarding the use of force against civilians, and in failing to adequately supervise defendants in the performance of their occupational duties.

**WHEREFORE**, plaintiff DR. RACHEL WELLNER demands judgment in the sum of ten million dollars ($10,000,000.00) in compensatory damages, twenty million dollars ($20,000,000.00) in punitive damages, plus attorney's fees, costs, and disbursements of this action.

Dated: New York, New York
        March 21, 2017

BY: _____
    JON L. NORINSBERG
    Jon@norinsberglaw.com
    *Attorney for Plaintiff*
    225 Broadway, Suite 2700
    New York, N.Y. 10007
    (212) 791-5396