UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-8-19

DR. RACHEL WELLNER,

                    Plaintiff,

        - against -

CITY OF NEW YORK ET AL.,

                  Defendants.

16-cv-7032 (JGK)

**OPINION AND ORDER**

**JOHN G. KOELTL, District Judge:**

After a two-week jury trial, a jury found that defendant police officers Niguel Vega and Nicolett Davodian deprived the plaintiff of her right to a fair trial and awarded the plaintiff $1,181,549 in damages for past lost earnings. The defendants have renewed their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and have moved under Rule 59 for a new trial or, alternatively, remittitur. For the reasons explained below, the defendants' Rule 50 motion and motion for a new trial are **denied**, but their motion for remittitur is **granted.**

I.

It is well-established that a district court should deny a Rule 50 motion unless, "viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one

conclusion as to the verdict that reasonable [persons] could
have reached.'" Cruz v. Local Union No. 3 of the Int'l Bhd. of
Elec. Workers, 34 F.3d 1148, 1154-55 (2d Cir. 1994) (alteration
in original) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d
Cir. 1970)). A trial court considering a motion under Rule 50(b)
"must view the evidence in a light most favorable to the
nonmovant and grant that party every reasonable inference that
the jury might have drawn in its favor." Samuels v. Air Transp.
Local 504, 992 F.2d 12, 16 (2d Cir. 1993). A jury verdict should
be set aside only when "there is such a complete absence of
evidence supporting the verdict that the jury's findings could
only have been the result of sheer surmise and conjecture, or
[where there is] such an overwhelming amount of evidence in
favor of the movant that reasonable and fair minded [jurors]
could not arrive at a verdict against [the movant]." Logan v.
Bennington Coll. Corp., 72 F.3d 1017, 1022 (2d Cir. 1995)
(quotation marks omitted, alterations in original).

Under Rule 59, a "court may, on motion, grant a new trial
on all or some of the issues - and to any party . . . after a
jury trial, for any reason for which a new trial has heretofore
been granted in an action at law in federal court." Fed. R. Civ.
P. 59(a)(1)(A). The Court of Appeals for the Second Circuit has
explained that "[a] district court may grant a new trial
pursuant to Rule 59 even when there is evidence to support the

2

jury's verdict, so long as the court 'determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice.'" AMW Materials Testing, Inc. v. Town of Babylon, 584 F.3d 436, 456 (2d Cir. 2009) (quoting Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005)); see also Mazzei v. Money Store, 308 F.R.D. 92, 100, 106–07 (S.D.N.Y. 2015), aff'd, 829 F.3d 260 (2d Cir. 2016). "If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." Tingley Sys., Inc. v. Norse Sys., Inc., 49 F.3d 93, 96 (2d Cir. 1995).

Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2d Cir. 1990) (quotation marks omitted). When, as in this case, a claim is brought under federal law, remittitur may be ordered where: (1) an identifiable error caused the jury to award a quantifiable amount that should be stricken, or (2) the award is so high as to shock the judicial conscience although the error cannot be attributed to a specific, quantifiable error. See Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir. 1998); Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990); see

3

also Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996). To determine whether an award of damages is shockingly excessive, "courts have reviewed awards in other cases involving similar injuries, bearing in mind that any given judgment depends on a unique set of facts and circumstances." Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 684 (2d Cir. 1993) (quotation marks omitted); see also Reiter v. Metro. Transp. Auth. of N.Y., No. 01cv2762, 2003 WL 22271223, at *2-3 (S.D.N.Y. Sept. 30, 2003).

## II.

### A.

The plaintiff brought this action on September 9, 2016, alleging claims under 42 U.S.C. § 1983 and state law relating to a February 18, 2016 incident between the plaintiff and defendant police officers Vega and Davodian in which the plaintiff was arrested and subsequently prosecuted. The defendants moved to dismiss the plaintiff's first amended complaint, and the Court granted that motion in part, denied it in part, and dismissed several of the plaintiff's claims. The defendants then moved for summary judgment dismissing the plaintiff's remaining claims. The Court again granted the defendants' motion in part, denied it in part, and dismissed several more of the plaintiff's claims. The plaintiff was left with claims under § 1983 for excessive force, failure to intervene, and denial of the right to a fair trial; and claims under state law for assault,

battery, and intentional infliction of emotional distress. The parties tried the plaintiff's remaining claims before a jury.[1]

At the close of the plaintiff's case, the defendants moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law dismissing the plaintiff's claims. The Court denied that motion. Ultimately, the jury returned a special verdict form finding that Officers Vega and Davodian both denied the plaintiff her right to a fair trial in the state-court proceedings that followed her arrest. The jury did not find that the plaintiff proved any other claim against either defendant. The jury awarded the plaintiff damages in the amount of $1,181,549 for past lost earnings, and no other damages.

Following the jury's verdict, the defendants renewed their motion for judgment as a matter of law under Rule 50(b) and moved under Rule 59 for a new trial or, alternatively, remittitur.

## B.

There was sufficient evidence introduced at trial from which the jury reasonably could have found as follows.

## 1.

On February 18, 2016, the plaintiff parked her car in a crosswalk outside a Vitamin Shoppe on the corner of 55th Street

---

[1] The parties agreed that it was unnecessary to present the claims for assault and battery to the jury.

and 8th Avenue in New York City, New York. Tr. at 524, 528-29. Officers Vega and Davodian approached the plaintiff's vehicle, and Officer Vega began writing the plaintiff a ticket. Tr. at 54, 66, 530-32. The plaintiff briefly went back into the Vitamin Shoppe and then waited in her car while Officer Vega wrote the ticket. Tr. at 65-68, 530-32. However, before Officer Vega finished writing the ticket, the plaintiff got out of her car, and an altercation between the two of them took place during which Officer Vega tried to restrain the plaintiff. See Tr. at 71-77, 86-87, 534-42. The plaintiff reentered her vehicle during the altercation and drove away from the scene while Officer Vega was near her vehicle. See Tr. at 87-88, 90-99, 542-46. The plaintiff stopped her vehicle a few blocks away from the scene and was arrested. Tr. at 126, 546. The plaintiff denied hitting Officer Vega with her car. Tr. at 545-46.

Following the plaintiff's arrest, Officers Vega and Davodian spoke to Assistant District Attorney ("ADA") Michael McCarthy about the incident. Sometime after 10:00 PM on the night of the incident, Officer Davodian told ADA McCarthy that the plaintiff hit both of Officer Vega's legs with her vehicle, causing swelling, bruising, and pain in Officer Vega's legs. Tr. at 330, 332. Officer Davodian also told ADA McCarthy during that conversation that the plaintiff stated, "I'm the hero. The cops are not." Tr. at 332. In one conversation, Officer Davodian told

ADA McCarthy that the plaintiff also stated that "all female cops are dykes." Tr. at 340.

ADA McCarthy spoke with Officer Vega sometime within a couple weeks of the incident. See Tr. at 340-41. Officer Vega told ADA McCarthy that the plaintiff struck him with her vehicle, but that she struck him in only one of his shins, causing bruising and swelling. Tr. at 341-42. Officer Vega also told ADA McCarthy that the plaintiff said something along the lines of, "I'm the hero. The Cops are not." See Tr. at 349-50. The plaintiff denied making the derogatory remarks about the police. Tr. at 554.

The plaintiff was charged with reckless endangerment in the second degree, N.Y. Penal L. § 120.20; resisting arrest, N.Y. Penal L. § 205.30; leaving the scene of an incident without reporting personal injury, N.Y. Veh. Traf. L. § 600(2)(a), (c); and reckless driving, N.Y. Veh. Traf. L. § 1212. Trial Ex. 9. ADA McCarthy testified that he relied on the truthfulness of what Officers Vega and Davodian told him in bringing criminal charges against the plaintiff. Tr. at 339, 342. It was "important," indeed "critical," to ADA McCarthy that Officer Vega was allegedly hit and injured by the plaintiff's vehicle. Tr. at 342. Officer Vega's claimed injury was significant to the charge against the plaintiff of leaving the scene of an incident without reporting personal injury. Tr. at 342-43. And that the

7

plaintiff allegedly struck Officer Vega with her vehicle "was an important part of the reckless endangerment charge." Tr. at 343.

The plaintiff was taken to the precinct following her arrest, where she remained in confinement for about twelve hours. See Tr. at 548, 551. She was then transported to Central Booking, where she spent approximately another twelve hours. Tr. at 551-52. While at Central Booking, the plaintiff was arraigned on the charges against her. Tr. at 552. Because of the charges against her, the plaintiff was required to make approximately four court appearances. Tr. at 555-56. The plaintiff and ADA McCarthy ultimately reached a plea agreement wherein the plaintiff pleaded guilty to disorderly conduct – namely, obstructing pedestrian traffic – with a promised sentence of ten days of community service. Tr. at 352. The other charges against the plaintiff were dropped. See id.

**2.**

The plaintiff claims that Officers Vega and Davodian collectively made four false representations to ADA McCarthy: (1) that Officer Vega was struck by the plaintiff's car, (2) that Officer Vega sustained a leg injury, (3) that the plaintiff said that she was the hero and the cops were not, and (4) that the plaintiff said that all female cops are dykes. The jury could reasonably find that the officers made each of these representations and that the representations were false.

The jury was shown slow-motion and regular-speed videos of the point of the February 18, 2016 incident at which Officer Vega was allegedly struck by the plaintiff's car, as well as still photos derived from the videos. And the plaintiff testified that she did not hit Officer Vega with her vehicle. Tr. at 545-46. She added that she had checked to make sure there was space between Officer Vega and her vehicle before accelerating and that she did not feel any impact upon driving away. Tr. at 545-46. Moreover, two of the defendants' eye witnesses could not confirm that the plaintiff's vehicle contacted Officer Vega. Tr. at 1028, 1050.

Additionally, the jury was shown emergency room records from the day of the incident stating that Officer Vega suffered no bruising, swelling, redness, bleeding, loss of range of motion, or loss of sensation in the leg he claimed the plaintiff hit with her car. Trial Ex. I. And the plaintiff's expert witness testified that, based on the medical records, he did not believe that Officer Vega sustained an injury as a result of being allegedly hit by the plaintiff's car; he also testified that there was no objective evidence of such an injury. Tr. at 470-71. Additionally, Officer Davodian testified that she did not actually see any bruising or swelling on Officer Vega's legs, Tr. at 265, and Officer Vega testified that he did not

develop any bruising on his leg on the day of the incident or the days after, Tr. at 129.

Finally, the plaintiff denied making either of the inflammatory statements relayed to ADA McCarthy by Officers Vega and Davodian, Tr. at 531, 554, and the defendants presented no evidence that the plaintiff made these statements to the defendant officers apart from the testimony of the defendant officers themselves.[2]

**3.**

As of February 18, 2016, the plaintiff was employed as a cancer surgeon at Montefiore Medical Center where she earned $450,000 annually and was eligible to earn a $25,000 yearly bonus. Tr. at 520–21. The plaintiff was placed on paid administrative leave shortly after the February 18 incident and was ultimately terminated from her position at Montefiore on July 5, 2016. Tr. at 573, 828, 839, 841, 903. Among other damages, the plaintiff sought damages for past lost earnings caused by her termination. The plaintiff's damages expert calculated the plaintiff's past lost earnings – from the time of the plaintiff's termination to the time of the expert's testimony – to be $1,181,549. Tr. at 904. This figure

---

[2] Detective Matthew Marmorowski, who arrested the plaintiff, testified that the plaintiff made similar inflammatory statements to him at the scene of the plaintiff's arrest. Tr. at 1003–04. However, Detective Marmorowski did not testify that the plaintiff made such inflammatory statements to either of the defendant officers.

represented what the plaintiff would have earned had she continued working at Montefiore as a cancer surgeon during that period. Tr. at 903–04.

Dr. Michler, the surgeon-in-chief of Montefiore's Healthcare System, testified about the plaintiff's termination. Dr. Michler hired the plaintiff in the summer of 2015. Tr. at 825. He was also involved in the decision to terminate the plaintiff. Tr. at 830. Dr. Michler learned of the plaintiff's arrest through another Montefiore surgeon shortly after the arrest occurred and then saw a news article and news story about the arrest. Tr. at 827. Upon learning of the plaintiff's arrest, Dr. Michler immediately formed the opinion that the plaintiff should be terminated. Tr. at 841–42, 856. Dr. Michler testified,

> [F]rom the moment that I learned of the arrest, I was concerned significantly by it. I was concerned that she was, first and foremost, arrested; second, that she had left the scene of the crime; and, thirdly, that she had struck a police officer while leaving the scene of the crime.

Tr. at 829.

After initially hearing about the plaintiff's arrest from another Montefiore surgeon, Dr. Michler learned the details of the arrest primarily from the press. Id. He testified that the statements and behaviors the press attributed to the plaintiff, including the "I'm the hero" statement and the conduct in hitting a police officer, played a role in his decision to

11

terminate the plaintiff, as did the publicity surrounding the plaintiff's arrest. Tr. at 830-31. Moreover, Dr. Michler thought that the incident as a whole caused the plaintiff to lose credibility as a physician. See Tr. at 832-33. Dr. Michler added that in deciding to terminate the plaintiff, he also considered that the plaintiff did not provide him any information supporting her version of the events. Tr. at 854. Finally, Dr. Michler testified that the plaintiff's failure to provide him updates regarding her criminal case during the four months following her arrest impacted his decision, but "[n]ot in a significant way." Tr. at 839-40, 854. Indeed, he had made up his mind to terminate the plaintiff on "day one." Tr. at 856. Had the February 18, 2016 incident not occurred, Dr. Michler would not have terminated the plaintiff. Tr. at 833.

The plaintiff testified that, following her termination, she was unable to obtain employment despite applying to "50 places or more" and receiving offers to interview at some of these places. Tr. at 572-77. The plaintiff attributed her inability to gain employment as a surgeon to a "story that was told" about her that "ruined [her] credibility as a person and a surgeon." Tr. at 577.

**4.**

With respect to the plaintiff's denial of the right to a fair trial claim, the Court instructed the jury as follows:

> To establish a claim of denial of the right to a fair
> trial, the plaintiff must prove by a preponderance of
> the evidence as to the defendant you are considering
> that: One, the defendant fabricated evidence of a
> material nature. Two, the fabricated evidence of a
> material nature was likely to influence a jury's
> decision. Three, this fabricated evidence of a material
> nature was intentionally forwarded to a prosecutor by
> the defendant. And four, the plaintiff suffered a
> deprivation of liberty as a result of the fabricated
> evidence of a material nature.

Tr. at 1213. The jury returned a special verdict form finding

that Officers Vega and Davodian both denied the plaintiff her

right to a fair trial. Tr. at 1270-71. The jury awarded the

plaintiff $1,181,549 in damages representing past lost earnings,

matching the figure to which the plaintiff's damages expert

testified. Tr. at 904, 1271.

### III.

The defendants argue that no reasonable jury could have

found that the plaintiff was denied her right to a fair trial by

either defendant officer because: (1) the plaintiff presented no

evidence that she suffered a deprivation of liberty due to the

defendant officers' telling ADA McCarthy that the plaintiff

struck and injured Officer Vega with her vehicle, (2) none of

the allegedly fabricated statements were material to the charges

brought against the plaintiff, and (3) recent Supreme Court

precedent requires the plaintiff to prove that the proceedings

terminated in her favor, which she failed to do. None of these

arguments are persuasive.

**A.**

The plaintiff may prove the deprivation of liberty element
of her denial of the right to a fair trial claim by proving
that, because of fabricated evidence, she made several court
appearances and suffered some other restriction. Cf. Murphy v.
Lynn, 118 F.3d 938, 946 (2d Cir. 1997) (holding that a defendant
who faced travel restrictions and was compelled to appear in
court multiple times was seized within the meaning of the Fourth
Amendment); Ashley v. Civil, No. 14cv5559, 2019 WL 1441124, at
*7 (E.D.N.Y. Apr. 1, 2019) (holding that appearing in court on
seven occasions could constitute a deprivation of liberty);
Perez v. Duran, 962 F. Supp. 2d 533, 540-43 (S.D.N.Y. 2013)
(holding that requiring the plaintiff to make two court
appearances and comply with travel restrictions could constitute
a "sufficient post-arraignment liberty restraint to implicate
the plaintiff's Fourth Amendment rights").[3] In this case, the
plaintiff testified that she was detained at the precinct for
twelve hours, spent approximately another twelve hours in
Central Booking, and made four court appearances due to the

---

[3] Compare the cited cases, with Faruki v. City of New York, 517 F. App'x
1, 2 (2d Cir. 2013) (holding that having to make two court appearances does
not constitute a deprivation of liberty); Burg v. Gosselin, 591 F.3d 95, 101
(2d Cir. 2010) (holding that a pre-arraignment, non-felony summons requiring
no more than a later court appearance does not, by itself, constitute a
deprivation of liberty); Arbuckle v. City of New York, No. 14cv10248, 2016 WL
5793741, at *11 (S.D.N.Y. Sept. 30, 2016) ("[M]erely having to respond to
orders of the court and attend court hearings is insufficient to allege a
deprivation of liberty.").

charges against her. This is sufficient to establish a deprivation of liberty.

The defendants argue that there was no evidence that the plaintiff's deprivation of liberty was caused by the fabricated information because the plaintiff was lawfully arrested for – and could be charged on the basis of – parking illegally in a crosswalk, resisting Officer Vega's attempts to restrain her, and driving away from the scene. But ADA McCarthy testified that he relied on the statements of Officers Davodian and Vega, and that their claim that Officer Vega was struck and injured by the plaintiff's vehicle was important to his decision to bring charges. A reasonable jury could find that the plaintiff did not hit or injure Officer Vega with her vehicle, the defendant officers fabricated that evidence, ADA McCarthy would not have brought all four charges against the plaintiff but-for that fabricated evidence, and, as a result, the plaintiff would not have been held for the length of time the plaintiff was detained or required to make four court appearances.

Officer Davodian spoke with ADA McCarthy the night of the incident in question. A reasonable jury could conclude that if Officer Davodian had not told ADA McCarthy that night that the plaintiff struck and injured Officer Vega with her vehicle, the plaintiff would not have spent as much time detained at the precinct and Central Booking.

Therefore, the defendants' argument that the defendant officers' fabrication of evidence did not cause the plaintiff any deprivation of liberty fails.

**B.**

The defendants also argue that the plaintiff did not show that the evidence Officers Vega and Davodian allegedly fabricated was material to the charges brought against the plaintiff. But, as stated above, ADA McCarthy found the officers' statements about the plaintiff's hitting and injuring Officer Vega with her car to be important in his decision to bring charges. A reasonable jury could certainly find that this information, which was important to the prosecutor's charging decision, was material – or, likely to influence a jury in the plaintiff's criminal case.

**C.**

The defendants next argue that the recent Supreme Court decision McDonough v. Smith, 139 S. Ct. 2149 (2019), adds an element to a claim for the denial of the right to fair trial – namely, that the prosecution against the accused must end in the accused's favor.[4] In this case, the defendants argue, the

---

[4] The plaintiff claims that this argument was raised improperly for the first time in the defendants' reply brief. However, McDonough was decided in the period between the defendants' filing of their moving brief and their reply brief. Therefore, the defendants could not have made this argument in their moving brief, and the Court may consider the argument. See Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 252 (2d Cir. 2005) (stating that district courts have discretion to consider arguments made for the first time in a

plaintiff's criminal case did not end in her favor because she ultimately pleaded guilty to disorderly conduct and had to perform ten days of community service as a punishment. The plaintiff was initially charged with four misdemeanors and eventually pleaded guilty only to the "offense" of disorderly conduct – specifically, obstructing pedestrian traffic – which is not considered a crime. Tr. at 352-53.

McDonough held that the statute of limitations on a fabricated evidence claim does not begin to run until "the criminal proceeding has ended in the [accused's] favor, or a resulting conviction has been invalidated within the meaning of Heck[ v. Humphrey, 512 U.S. 477, 486-87 (1994)]." McDonough, 139 S. Ct. at 2158. In Heck, upon which the Supreme Court relied in McDonough, the Supreme Court held that

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . , or called into question by a federal court's issuance of a writ of habeas corpus.

512 U.S. at 486-87. The petitioner in Heck sought damages for a claim akin to malicious prosecution despite the fact that he was

---

reply brief). The plaintiff has responded to the argument and therefore the plaintiff has not been prejudiced by the Court's consideration of the argument.

convicted. The Supreme Court held that his claim was properly dismissed.

In McDonough, the petitioner was acquitted and there was therefore no question that the prosecution was terminated in his favor. Thus, the petitioner's § 1983 claim did not question the validity of his conviction. McDonough therefore offered no occasion to determine whether a plaintiff could pursue a fabricated evidence claim despite the existence of some conviction. The Supreme Court was clear on this issue. Justice Sotomayor wrote for the Court as follows:

> Because McDonough's acquittal was unquestionably a favorable termination, we have no occasion to address the broader range of ways a criminal prosecution (as opposed to a conviction) might end favorably to the accused. Cf. Heck, 512 U.S. at 486-487 . . . . To the extent Smith argues that the law in this area should take account of prosecutors' broad discretion over such matters as the terms on which pleas will be offered or whether charges will be dropped, those arguments more properly bear on the question whether a given resolution should be understood as favorable or not. Such considerations might call for a context-specific and more capacious understanding of what constitutes "favorable" termination for purposes of a § 1983 false-evidence claim, but that is not the question before us.

McDonough, 139 S. Ct. at 2160 n.10.

The plaintiff's denial of the right to a fair trial claim is a paradigm case where her claim does not question the validity of her conviction for the "offense" of disorderly conduct based on her parking in a crosswalk and obstructing pedestrian traffic. She never contested that issue. All of the

misdemeanor charges against the plaintiff were dropped, including specifically the two charges as to which the alleged false evidence applied – namely the charge of leaving the scene of an incident without reporting personal injury and reckless endangerment in the second degree. Thus, her denial of the right to a fair trial claim only accrued under McDonough when her prosecution was terminated. And her claim in no way seeks to recover damages, in violation of Heck, for a wrongful conviction or resulting imprisonment and in no way calls into question her conviction for the offense of disorderly conduct.

## IV.

Finally, the defendants contend that the past lost earnings the plaintiff suffered due to her termination from Montefiore are unrelated to the deprivation of liberty she experienced as a result of her being denied her right to a fair trial. Because of this missing causal link, the defendants claim that the $1,181,549 award for past lost earnings is excessive.

The parties agree that damages for past lost earnings can be awarded following a finding that a plaintiff has been denied the right to a fair trial. Pl.'s Supp'l Br. at 2–3; Defs.' Supp'l Br. at 3. Moreover, that proposition is supported by cases involving denial of the right to a fair trial claims and similar claims. See Morse v. Fusto, No. 07cv4793, 2013 WL 4647603, at *26 (E.D.N.Y. Aug. 29, 2013) (upholding a jury

verdict awarding over $1,700,000 in past lost earnings based on the jury's finding that the defendants violated the plaintiff's right to a fair trial), aff'd, 804 F.3d 538 (2d Cir. 2015); cf. B.C.R. Transp. Co. v. Fontaine, 727 F.2d 7, 12 (1st Cir. 1984) (sustaining a jury award of $75,000 in compensatory damages where the plaintiffs' business "had been destroyed as a business entity as a result of [an unlawful] search and [the] attendant publicity"); Harris v. City of New York, No. 15cv8456, 2017 WL 6501912, at *9 (S.D.N.Y. Dec. 15, 2017) ("If Plaintiff lost wages, he can present evidence of that as damages attributable to his false arrest."). But the parties disagree as to whether the jury in this case could reasonably find that the plaintiff's past lost earnings were caused by the defendant officers' fabrication of evidence and the attendant deprivation of liberty the plaintiff suffered.

The defendants contend that the evidence Officers Vega and Davodian fabricated related only to one of the four criminal charges filed against the plaintiff: leaving the scene of an incident without reporting personal injury. The defendants maintain that because the other charges could have been brought against the plaintiff notwithstanding the fabricated evidence, her prosecution was valid and any damages resulting from her prosecution are not attributable to the officers' fabrication of evidence.

However, ADA McCarthy also testified that the evidence related to the plaintiff's hitting Officer Vega with her vehicle was "an important part" of the reckless endangerment charge brought against the plaintiff. Tr. at 343. And in any event, the jury found generally that the plaintiff was denied her right to a fair trial; it did not, and was not required to, attribute any such denial to a particular criminal charge for which the plaintiff was prosecuted. There can be more than one cause of a tort, see Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 15 (2d Cir. 2000),[5] and the defendants have not proved that it was the plaintiff's prosecution for charges other than leaving the scene of an incident without reporting personal injury and reckless endangerment that resulted in her being deprived of her liberty. Nor have the defendants pointed to any other superseding cause of the plaintiff's deprivation of liberty. Warner v. Orange Cty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1996) (noting that "in cases brought under § 1983 a superseding cause, as traditionally understood in common law tort doctrine, will relieve a defendant of liability"). Moreover, the jury could reasonably conclude from the evidence presented at trial that the defendant officers' fabrication of

---

[5] "[T]he Supreme Court has made it crystal clear that principles of causation borrowed from tort law are relevant to civil rights actions brought under section 1983." Warner v. Orange Cty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1996) (alteration in original) (quoting Buenrostro v. Collazo, 973 F.2d 39, 45 (1st Cir. 1992)).

evidence was a substantial factor in the plaintiff's deprivation of liberty. See Hydro, 227 F.3d at 15; Noga v. City of Schenectady Police Officers, 169 F. Supp. 2d 83, 89 (N.D.N.Y. 2001).

The defendants next argue that even if the fabricated evidence led to the plaintiff's deprivation of liberty – namely, her detention and subsequent related court appearances – it did not cause her to be terminated from her job. This argument has some force.[6] Even recognizing that injuries might have several causes, and that proximate cause is an issue particularly fit for determination by a jury, see Noga, 169 F. Supp. 2d at 89, the evidence presented to the jury was "too tenuous" in this case for the jury to connect the defendant officers' fabrication of evidence to the plaintiff's termination, see Carmichael v. City of New York, 34 F. Supp. 3d 252, 268 (E.D.N.Y. 2014).

The plaintiff elicited testimony about the reasons for her termination solely from Dr. Michler,[7] who was involved in Montefiore's decision to terminate the plaintiff. Dr. Michler

---

[6] The defendants also argue that the plaintiff's past lost earnings were attributable, at least in part, to her own actions and failure to mitigate her losses. That argument, however, is not persuasive. The jury clearly had enough evidence to reject that proposition.

[7] The plaintiff herself testified briefly about the reasons for her termination, stating that she was terminated because of her arrest and the negative publicity surrounding her arrest. Tr. at 729-30. The plaintiff's arrest came before the fabrication of evidence and, for the reasons explained below, any negative publicity is not related to the defendant officers' fabrication of evidence.

testified that he had decided to terminate the plaintiff on "day one" because of the plaintiff's arrest – which took place before the fabrication of evidence – and the circumstances of, and publicity surrounding, her arrest. Dr. Michler learned the details of the plaintiff's arrest from a colleague and primarily from the press. Dr. Michler also testified that, in deciding to terminate the plaintiff, he considered her failure to provide information supporting her side of the story and that he considered, but not significantly, the plaintiff's failure to update him with respect to her criminal case. He did not testify, however, that the criminal charges brought against the plaintiff, which were based on the fabricated evidence, affected his decision to terminate her. Nor did Dr. Michler testify that the plaintiff's detention or court appearances influenced his decision. In short, the plaintiff failed to present evidence showing that the defendant officers' fabrication of evidence, or the attendant deprivation of liberty she suffered, caused her termination.

The plaintiff points out that Dr. Michler testified that his decision to terminate the plaintiff was based upon his belief that the plaintiff struck a police officer with a vehicle and made a statement along the lines of "I'm the hero. The cops are not." Because this is the same evidence that the jury reasonably could have found to be fabricated by the defendant

officers to ADA McCarthy, the plaintiff argues that the jury reasonably could have attributed the plaintiff's termination to the fabrication. But no evidence connects the fabricated evidence given to ADA McCarthy with the Montefiore surgeon who notified Dr. Michler of the plaintiff's arrest or the news sources through which Dr. Michler learned the details of the plaintiff's arrest when he decided to terminate her employment. And the plaintiff neither pleaded this connection in her first amended complaint nor pursued it throughout this litigation. In fact, in pleading a defamation claim in her first amended complaint, the plaintiff alleged that the defendant officers themselves provided news agencies false information concerning the plaintiff's arrest. First Am. Compl. ¶¶ 157-65. The Court dismissed that claim on summary judgment. Dkt. No. 138 at 45-46.

Thus, the plaintiff failed to present sufficient evidence to the jury that the fabricated evidence provided to the prosecutor on which her denial of the right to a fair trial claim was based, or the deprivation of liberty she suffered as a result, were substantial factors in her termination from Montefiore. And the plaintiff's past lost earnings claim for damages was based entirely on her termination – the $1,181,549 figure represented what she would have earned as a cancer surgeon at Montefiore between the time she was terminated and the time her damages expert testified at trial. Thus, a

reasonable jury could not have awarded past lost earnings as
compensation for the plaintiff's being denied her right to a
fair trial.

## V.

An award of $1,181,549 as damages for denial of the right
to a fair trial is plainly excessive and conscience-shocking
where, as here, the plaintiff failed to provide any evidence
connecting the defendant officers' fabrication of evidence, or
the attendant deprivation of liberty she suffered, to the loss
amount. But the record does support the conclusion that the
defendant officers' conduct deprived the plaintiff of her
liberty. The plaintiff was detained for about twenty-four hours,
at least some of which a reasonable jury could attribute to the
fabrications Officer Davodian made to ADA McCarthy the night of
the plaintiff's arrest. The plaintiff was also prosecuted on
four criminal charges and she made four court appearances
related to those charges, and Officer Vega also provided
information for those charges that the jury could find was
false.

Because the plaintiff was deprived of her liberty, the
Court should not negate all damages awarded to the plaintiff but
rather remit the amount of damages from $1,181,549 to $200,000.
This amount is in line with similar cases and, while not
including damages for lost earnings, which are not supported,

provides compensation for "physical injury, pain and suffering, mental anguish, shock, [or] sharp discomfort."[8] Tr. at 1221-22, 1273.

The plaintiff may accept $200,000 in damages or else retry the case solely on the issue of damages. See Textile Deliveries, Inc. v. Stagno, 52 F.3d 46, 49 (2d Cir. 1995) (affirming a jury's finding of liability and directing the trial court to retry the case solely on the issue of damages if the plaintiffs refused to accept a remitted damages award).

## CONCLUSION

The Court has considered all the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the defendants' Rule 50(b) motion and motion for a new trial are **denied**, but their motion for remittitur is **granted**.

---

[8] See Alla v. Verkay, 979 F. Supp. 2d 349, 372 (E.D.N.Y. 2013) (holding that a $300,000 award for a false arrest claim was not excessive where the plaintiff "was held for more than 9 hours, during which he experienced physical pain from the injuries sustained in the incident as well as emotional distress"); Thomas v. Kelly, 903 F. Supp. 2d 237, 263 (S.D.N.Y. 2012) (affirming a $125,000 award for a false arrest claim reflecting damages for loss of liberty and physical and emotional distress); Martinez v. Port Auth. of N.Y. & N.J., No. 01cv721, 2005 WL 2143333, at *20-22, 26 (S.D.N.Y. Sept. 2, 2005) (collecting cases) (remitting the plaintiff's damages for his false arrest claim, which included pain and suffering damages, from $1,000,000 to $360,000, and noting that $160,000 of that amount was for the plaintiff's loss of liberty itself), aff'd sub nom. Martinez v. The Port Auth. of N.Y & N.J., 445 F.3d 158 (2d Cir. 2006).

Although the jury did not award the plaintiff general compensatory damages in its verdict, the jury reasonably could have awarded such damages but refrained from doing so in light of the large amount it awarded in damages for past lost earnings.

The plaintiff may accept a remitted award of $200,000 or elect to try the case again solely on the issue of damages. The plaintiff should inform the Court of her decision by **August 30, 2019.**

The Clerk is directed to close docket number 210.

**SO ORDERED.**

Dated:    **New York, New York**
           **August 8, 2019**

                                                     **John G. Koeltl**
                               **United States District Judge**